## Rebmann Estate

*Paul C. Heintz, John J. Lombard, Jr.* and *Obermayer, Rebmann, Maxwell & Hippel,* for accountants.

Taxis, P. J., July 7, 1967.—The account of Girard Trust Bank and G. Ruhland Rebmann, Jr., executors, was examined and audited by the court on June 5, 1967.

The account shows a net balance of principal and income for distribution of $2,273,658.84, composed of the securities set forth on pages 2 through 10 of the account, and cash.

The transfer inheritance tax has been paid, but should any portion pass to collateral heirs, additional tax will become due.

At the time of audit, the accountants submitted to the court a question requiring determination relating to decedent's pledge to the Centennial Fund Campaign of Cornell University. G. Ruhland Rebmann, Jr., a coexecutor and brother of decedent, testified at length in this matter, and from the testimony the following is established.

In December 1963, decedent pledged $25,000 to the Centennial Campaign of Cornell University, and during his lifetime paid $5,898.25 on account thereof, leaving a balance due, as of the date of his death, of

$19,101.75. The executors have acknowledged this debt as an obligation of the estate, and have paid $14,101.75 on account, leaving a balance of $5,000 due.

This debt, in the amount of $19,101.75, was claimed by the estate as a deduction on the Federal estate tax return, but was disallowed by the government, which took the position that the debt was unenforceable against the estate by Cornell University for the reason that there was no valid consideration for decedent's promise to pay the pledge. Consequently, an additional Federal estate tax, attributed solely to the disallowance of this deduction, in the amount of $3,698.89, plus interest, was assessed against the estate. The Commissioner of Internal Revenue was notified of the time and place of audit, but did not appear and submit any testimony.

Decedent was an alumnus of Cornell University, as were his brothers Paul C. and G. Ruhland Rebmann, Jr., and early in the campaign for the Centennial Fund, decedent was solicited for a contribution by his brother, and in the course of discussions and meetings, the three brothers and sister each contributed $25,000, or a total of $100,000, to the Cornell Centennial Campaign. Later, as the campaign progressed, G. Ruhland Rebmann, Jr., evolved the idea that designating as many gifts from the Philadelphia area as possible to a Greater Philadelphia Professorship would stimulate gifts from others. He informed decedent, his brothers and his sister, and they agreed that the pledge which they had previously made should be designated for this purpose, and that their subscriptions could be used as an inducement to others in soliciting the balance of the funds necessary to establish the professorship. The final drive of the campaign proceeded with the use of pledge cards, specifically designating the "Greater Philadelphia" Professorship as its purpose. As a result of this understanding, others were solicited, and

they were advised how much had been previously subscribed for the professorship, and this included the amounts previously pledged by decedent, his brothers and sister.

As a result, $400,000 was subscribed, and the university was then able to use Ford Foundation funds to establish the professorship, and pay the professor for a period of five years, while the balance of the subscriptions could be collected and the income accumulated so that, at the end of the five-year period, the professorship would become selfsustaining on the total amount subscribed, plus the accumulated income during the interim five-year period. Cornell University, in using the available Ford Foundation funds immediately to establish the professorship, therefore relied upon the fact that decedent and the other subscribers for this specific project would fulfill this obligation on their subscriptions.

Pennsylvania law recognizes the view that consideration for charitable subscriptions may be found in the mutual or inducing promises of subscribers.

In Converse's Estate, 240 Pa. 458, the court held the personal representatives bound where decedent had promised $10,000 once an endowment fund's goal of $200,000 had been covered by pledges or payments. The court said:

". . . Mr. Converse's promise by reason of the other subscriptions induced thereby became a contract based upon a valuable consideration the fulfilment of which might be as well performed by his representatives after his death as by himself . . .": 240 Pa. 458, 462.

Similarly, where three brothers had agreed to give another party a certain sum, the court held in Hostetter v. Hollinger, 117 Pa. 606, that the personal representatives of one of the three were bound to carry through the pledge after the two survivors contributed their shares. The court said that the promise and

payment of their shares by the survivors, in furtherance of a common purpose, constituted sufficient consideration. See Ryerss v. The Trustees of The Presbyterian Congregation of Blossburg, 33 Pa. 114; First Evangelical Lutheran Church v. Gardner, 28 Pa. Superior Ct. 82.

The facts place the instant case squarely under the line of cases in which the pledge is deemed a contract legally binding on the pledgor and his personal representatives. Decedent's promise, indeed, was a promise made mutually with others, and was a promise used to induce the pledges of others.

The conclusion reached in the recent case of Brooks Estate, 40 D. & C. 2d 491, denying the enforceability of a charitable pledge to a hospital, appears to be contrary to the line of Pennsylvania cases supporting the enforceability of charitable pledges. However, that case may be distinguishable in that the hospital failed to show that the document was knowingly used as an inducement to others to contribute to the building drive, and, secondly, the language of the document was phrased in terms of a declaration of intent rather than a promise to pay.

In the instant case, decedent, with other members of his family, pledged $100,000 toward a project where $400,000 was raised. The fact that this large sum was already committed was, of necessity, a substantial inducement to others knowing that the goal of the local campaign was within reach. Therefore, the mutuality of the promises of the other members of decedent's family alone could be found to supply the necessary consideration for his promise. This consideration is further enhanced by the fact that the subscription was used, with his approval, as an inducement to others to secure their commitment to the campaign.

Pennsylvania law recognizes the view that the reliance of the promisee on the pledge constitutes consideration for such pledge, making it a binding contract: 50 Am. Jur., Subscriptions, §15, 83 C.J.S., Subscriptions, §5(2) and 35 P. L. Encyc., Subscriptions, §2.

The court, in University of Pennsylvania's Trustees v. Coxe's Exrs., 277 Pa. 512 (1923), held a pledge to a university for a certain project a binding contract when the university commenced work on the project. The court said:

"The trustees, relying upon the subscriptions . . . incur obligations in carrying out the purposes for which the funds were intended . . . This action on their part constituted a consideration which made the gift irrevocable and binding, not only upon the donors, but upon their representatives after their death . . .": 277 Pa. at 516.

Similarly, where a pledge was given for missionary work in a certain area and the work was begun, the consideration was held by the Supreme Court to be furnished such that a binding contract was created: Presbyterian Board of Foreign Missions v. Smith, 209 Pa. 361 (1904). Here, the court said:

". . . A test of good consideration is whether the promisee at the instance of the promisor, has done, forborne or undertaken to do anything real, or whether he has suffered any detriment or whether in return for the promise he has done something that he was not bound to do or has promised to do some act or has abstained from doing something": 209 Pa. at 363.

There is no question that decedent, through his pledge inducing Cornell University to procure the equivalent of matching funds from the Ford Foundation to establish and sustain the proposed chair, at least temporarily, thereby caused Cornell to do some-

554

thing it was not bound to do, and, in fact, which it probably could not have done otherwise. Under the criteria in the Presbyterian Board case, supra, this was sufficient to give rise to a consideration for the pledge; hence it is a contract binding on the pledgor and his personal representatives.

The pledge of Walter Rebmann to the Cornell University Centennial Campaign, in view of all the surrounding circumstances, including the mutual promises of other members of his family, the knowing use of the pledge to induce others to give, and the reliance thereon by Cornell University in establishing the Greater Philadelphia Professorship, was supported by legal consideration, thereby making the balance due at the date of his death a proper claim against his estate. The payment of $14,101.75 by the estate, and the acknowledgement of the balance due of $5,000, is hereby approved by this court. . . .

And now, July 7, 1967, this adjudication is confirmed nisi.