## Wanamaker's Estate

Before Gest, Henderson, Van Dusen, Stearne and Sinkler, JJ.

The facts appear from the following extract from the adjudication of

GEST, J., Auditing Judge.—The Young Women's Christian Association is a charitable corporation and established a branch for colored women at Nos. 756-758 South Sixteenth Street, Philadelphia, Pa. Its claim was based on a letter from William R. Nicholson (who was soliciting subscriptions for said Y. W. C. A.) to John Wanamaker, dated June 6, 1922, a letter dated June 7, 1922, from John Wanamaker to William R. Nicholson, and the reply of the letter to John Wanamaker dated June 8, 1922. The decedent died December 12, 1922, and the account of the executors was filed on December 29, 1924, so I premise that the statute of limitations has no application to the case: Hillborn's Estate, 5 Dist. R. 265; Ritchey's Estate, 8 Pa. Superior Ct. 527. And the testimony of Bertha Morgan on the subject was properly admitted, as she was a mere employe of the claimant corporation, and not an officer or director thereof. The sole question is whether there was in law a sufficient consideration for the promise.

The case is peculiar in facts, as the letters referred to are very vague in phraseology. They are as follows:

"Capital $3,000,000          Surplus $9,000,000
          "The Land Title and Trust Company
              "Broad and Chestnut Streets
                  "Philadelphia
"William R. Nicholson, President                    "June 6th, 1922.
"Hon. John Wanamaker, Philadelphia, Pa.

"My dear Mr. Wanamaker: In pursuance of my agreement this morning to give you in writing the result of our conversation concerning the Colored Y. W.

C. A. branch at 16th and Catharine Streets, would say that work is now actually under way by Robert E. Lamb & Company who have contracted to erect the new building on the Catharine Street front and remodel the two houses on 16th Street for the Dormitory for the sum of $103,253. The contracts for lighting, heating, plumbing, installation of swimming pool and furnishings (which have not been let) will amount to $72,000. With the funds on hand and the balance of your subscription and Mr. Rodman Wanamaker's, they will be short about $36,000, which may be obtained on mortgage. My suggestion to you was that in consideration of your finding $20,000 of this sum (about the value of Mrs. Elizabeth W. Fry's property which you suggested might be used for the purpose) the Association would dedicate the Sixteenth Street building as 'The Elizabeth W. Fry Dormitory.'

"Kindly let me know whether this is correct and agreeable to you.

"Yours very truly,<br>"WM. R. NICHOLSON."

"Private Office<br>"John Wanamaker<br>"Philadelphia.

"Mr. William R. Nicholson,                   "June 7th, 1922.
  "The Land Title & Trust Company, Philadelphia.

"Dear Mr. Nicholson: I have the courtesy of your letter, of the 6th, in regard to the Colored Young Women's Christian Association, at 16th and Catharine.

"I am ready to advance the $20,000 that is in the property, that I hope finally to give to the Colored Women's Christian Association Branch, in the sums of $5000 each, payment of the entire sum being within the next twelve months.

"Inasmuch as it was a matter that was considered two years ago, with me as the donor of the property, that had already been ceded to the Christian Association, that the building should be named the Elizabeth W. Fry Dormitory, I do not think that it would be proper to base that name on the final subscription of the $20,000. In other words, I think it has been more than two years since we first talked it over, as I had it in mind, that my blind sister, a Christian Church woman, should have her name put up as a memorial of her life in this simple and humble way.

"If you agree with me, will you kindly give me something that will be an assurance of that, that I may file away?

"Very truly yours,<br>"JOHN WANAMAKER."

"Hon. John Wanamaker, Philadelphia, Pa.         "June 8th, 1922.

"Dear Mr. Wanamaker: Many thanks on behalf of the Young Women's Christian Association for your kind offer to advance $20,000 towards the cost of the erection of the buildings for the Colored branch at 16th and Catharine Streets—You are correct in your statement that your offer to advance the money to meet the needs of the Association in the erection, was not the consideration for the action of the Board in dedicating the Dormitory to Mrs. Fry, but was done in gratitude of the offer made some time ago on her behalf to turn over her property to the Association.

"Yours very truly,<br>"........................."

The oral testimony of Bertha Morgan is also ambiguous in detail, as follows:

"Q. Were you aware that Mr. Nicholson talked to Mr. Wanamaker with regard to a subscription? A. I was. Q. And this was in connection with what particular branch of the association's work? A. Our colored branch known as

the Southwest Branch. Q. With regard to any particular property of that branch? A. A small property on Sixteenth Street, known as Nos. 756-58 South Sixteenth. Q. Did that adjoin other property of the association? A. It did; to the rear. Q. At that time you had plans for a certain development on Catharine Street; is that correct? A. It is. Q. Did you include in those plans any alteration with regard to Nos. 756-58 South Sixteenth? A. Minor alterations. Q. Did Mr. Nicholson communicate to you the contents of Mr. Wanamaker's letter of June 7th? A. He showed me Mr. Wanamaker's letter. Q. What did you do with regard to that letter, as far as the board of directors of the association was concerned? A. I reported the contents of the letter, and hoped that it would hold out for us. Q. And, as a result of that report, were any changes made in your plans regarding Nos. 756-58 South Sixteenth Street? A. Our plans were revised. Q. That was done subsequently to Mr. Wanamaker's letter of June 7th? A. That was done after 1923. Q. Were these plans carried out? A. They were. . . . Q. What other plans were made for paying the cost of the alterations? A. A mortgage was taken. Q. Does that mortgage still exist? A. It does. Q. How large is that mortgage? A. $36,000. . . ."

And on cross-examination:

"Q. I notice in this letter from Mr. Wanamaker he says: 'I am ready to advance the $20,000, that is in the property that I hope finally to give to the Colored Women's Christian Association Branch in sums of $5000 each, payment of the entire sum being within the next twelve months.' Can you explain that? A. Only that he said it was right to advance it, but he didn't advance it. Q. 'I am ready to advance the $20,000.' That was his property? A. Yes; he gave his sister the property."

By the court: "Q. That is Mrs. Fry? A. Yes, sir; and it is my understanding that Mr. Wanamaker expected to be the beneficiary of his sister's estate, and, therefore, would inherit at the same time this property, and it was the value of this property which he took or counted at $20,000 which he offered to advance."

By Mr. Remick: "Q. The offer of $20,000 was conditional on his receiving this property? A. It was; in our understanding it was conditional. It was on account of our expenses that he offered to advance it. Q. Prior to giving the property? A. Yes."

Robert E. Lamb, of the contracting company, testified that after June 7, 1922, and after Wanamaker's death, certain changes were made in his contract amounting to an additional cost of $5000, and while Bertha Morgan testified that after the receipt of Wanamaker's letter the plans were revised, the additional costs were by no means in the extent of $20,000, and there is nothing to show that any increase of the contract was based on John Wanamaker's promise. She also testified that the mortgage on the property was $36,000, which is exactly the sum mentioned in Nicholson's letter to John Wanamaker of June 6, 1922, as necessary after the payment of John Wanamaker's proposed subscription and that of Rodman Wanamaker. As Bertha Morgan also testified that it was understood that John Wanamaker's subscription was conditional on Elizabeth Fry's devise of a certain property to John Wanamaker, it would appear to me that this conditional subscription was without sufficient consideration to support it.

The present case is widely different from Converse's Estate, 240 Pa. 458. There the pledge of John H. Converse was in the following words:

"Dear Mr. McAfee:

"I have yours of the 5th inst. respecting the endowment fund of Park College. When I made the offer several years ago financial conditions were different, and I cannot now renew that pledge. I will, however, agree to give $10,000 towards

the endowment fund of $200,000, and pay the same when the entire amount is covered by valid pledges or payments.

"JOHN H. CONVERSE."

This court, affirmed by the Supreme Court, there said:

"We must conclude, therefore, that as other subscriptions were secured on the faith of Mr. Converse's promise, something had been done, money paid by others, and that consequently his promise had in his lifetime become a contract based upon a valuable consideration, and had he lived and $190,000 been paid or pledged, he would have been liable for the payment of his subscription of $10,000 and it could have been secured by legal process."

So, in University of Pennsylvania's Trustees v. Coxe's Exec'rs, 277 Pa. 512, the syllabus reads:

"Where subscribers agree to pay to the treasurer of a university 'at such time as he shall request,' the sums respectively set opposite to their names 'for the university museum,' and the trustees of the university incur obligations and enter into contracts for the construction of the museum, there is a good consideration for the subscription agreement, and the death of one of the subscribers, who had not paid the whole of his subscription, does not relieve his estate from payment of the balance."

These cases were reviewed by Trexler, J., in Walsh's Estate, 93 Pa. Superior Ct. 566, 568:

"It is settled that a subscription of the character of that which we have here cannot be enforced unless there is consideration supporting it. Such consideration will be found in the subscriptions made by others to the common object, or in the fact that the purpose of the subscription has been furthered and money spent, or at least a contract made on the faith of it. Thus in Lippincott's Estate, 21 Pa. Superior Ct. 214, this court held to make a valid subscription it must be for a consideration of other subscriptions having been made to the common object, or that on the faith of the subscription that construction was begun to carry out its purpose."

The claim of the Young Women's Christian Association is dismissed.

*Rodney T. Bonsall*, for exceptant; *Raymond M. Remick*, contra.

SINKLER, J., November 4, 1932.—A subscription for the benefit of a religious, charitable or educational institution, not at its origin enforceable in law, may be transformed into a contractual obligation when a good consideration arises. This occurs if others are induced to subscribe to the same purpose or if the institution in reliance upon the subscription undertakes to do or refrain from doing something. After the subscription has ripened into a contract it is not revoked by death, but remains a debt of the decedent. In determining whether or not the debt is proven against the estate the general principles of law relating to contracts apply.

The auditing judge has carefully considered the letters in which the subscription is contained and the testimony produced in behalf of the claimant. The letters he finds to be vague in phraseology and the testimony ambiguous. It further appears that the subscription was predicated upon a condition which did not happen. Both his findings of fact and his interpretation of the law are correct.

The exceptions are dismissed and the adjudication is confirmed absolutely.

LAMORELLE, P. J., did not sit.